**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **BRANDON T. MOOREFIELD** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **Case No.:** 1:26-CV-03197 |
| | § | |
| **AVIAT NETWORKS, INC., AVIAT U.S. INC., JOHN DOES 1-10, AND ABC CORPORATIONS 1-10 (said names being fictious)** | § § § § | |
| | § | |
| ***Defendants.*** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Brandon T. Moorefield ("Moorefield" or "Plaintiff") files this Original Complaint against Defendants Aviat Networks, Inc., Aviat U.S. Inc., John Does 1-10, and ABC Corporations 1-10 (said names being fictitious) (collectively "Defendants" and/or "Aviat") and, for cause of action, submits the following:

## THE PARTIES

1. Plaintiff Moorefield is a North Carolina resident with a principal residence of 315 Marsh Road, Charlotte, North Carolina, 28209.

2. Defendant Aviat Networks, Inc. is a Delaware corporation with its principal place of business located in Austin, Texas.

3. Defendant Aviat U.S. Inc. is a subsidiary of Aviat Networks, Inc., and is a Delaware corporation with its principal place of business located in Austin, Texas.

4. Defendant John Does 1-10 being a fictitious name for an unknown individual, involved in the facts that form the basis of this action.

5. Defendant ABC Corp. 1-10 being a fictitious name for an unknown corporation or other business entity, owned, operated, directed the corporation(s) involved in the alleged violation.

## INTRODUCTION

6. This lawsuit involves claims against Defendants for violations of Sarbanes-Oxley Act, 18 U.S.C.A. § 1514A(a)(1)(C) ("SOX").

7. Moorefield was employed by Defendants as a Vice President, Corporate Controller.

8. During his employment, Moorefield engaged in activity protected by SOX. Moorefield reported business practices that would cause Defendants to overstate their revenue or otherwise misrepresent financials, which would give misleading information in financial statements to shareholders and investors.

9. Defendants retaliated against Moorefield after he engaged in protected activity by terminating his employment, in violation of 18 U.S.C.A. § 1514A(a)(1)(C).

10. On February 16, 2026, Plaintiff filed a SOX complaint with the Occupational Safety and Health Administration ("OSHA") against Defendants.

11. The Department of Labor has not issued a final decision within 180 days of Moorefield's filing of his SOX complaint, and the delay is not due to any bad faith of the Plaintiff.

12. Accordingly, Moorefield timely exercises his right to bring his claims against Defendants for *de novo* review in this Court under 18 U.S.C.A. § 1514A(b)(1)(B).

## VENUE & JURISDICTION

13. This Court has federal jurisdiction over the claims asserted under 18 U.S.C.A. § 1514A by way of 28 U.S.C.A. § 1331.

14. Subject matter jurisdiction is proper under the Sarbanes Oxley Act "kick-out" provision of 18 U.S.C. § 1514A (b)(1)(B), which provides that, if the Secretary of Labor has not issued a final decision within 180 days of filing of the complaint with the Secretary of Labor and there is no showing that there has been delay due to the bad faith of the complainant, the

complainant may bring an action at law or equity for *de novo* review in the appropriate district court of the United States, which will have jurisdiction over such action without regard to the amount in controversy.

15. On February 16, 2026, Plaintiff filed his Sarbanes-Oxley complaint with OSHA against Defendants in accordance with 18 U.S.C.A. § 1514A(b)(2)(D), or within 180 days of his unlawful termination, which occurred on September 10, 2025.

16. Over 180 days have passed since Plaintiff filed a Sarbanes-Oxley complaint with OSHA against Defendants on February 16, 2026, and the Secretary of Labor has not issued a final decision and the delay is not due to any bad faith by Moorefield.

17. Thus, Moorefield has exhausted his administrative remedies and timely exercises his right to bring his claims against Defendants for *de novo* review in this Court under 18 U.S.C.A. § 1514A(b)(1)(B).

18. Venue is proper in the Western District pursuant to 28 U.S.C.A. § 1391(b)(1) and (2) because Defendants are headquartered in Austin, Texas, and this is the judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTS COMMON TO ALL COUNTS

### A. Moorefield's Employment With Aviat

19. On or about September 9, 2024, Moorefield was hired by Defendants for the role of Vice President, Corporate Controller ("Controller").

20. Moorefield worked fully remote from his home in North Carolina and reported to Aviat's then-CFO, Michael Connaway ("Connaway").

21. As Corporate Controller, Moorefield was responsible for overseeing Aviat's accounting functions, including but not limited to, invoicing customers and initiating the collection

process, managing the annual audit, maintaining effective internal controls over financial reporting, and facilitating the timely and accurate filing of Aviat's reports with the Securities and Exchange Commission ("SEC").

22. As part of Aviat's annual audit process, Aviat's external auditor, Deloitte, required the CEO, CFO, and Corporate Controller to sign a representation letter.

23. This representation letter is necessary to facilitate the filing of the 10-K. The letter is written confirmation that management has properly provided the auditors with all relevant information and that Aviat's financial statements are complete, free of material misstatements, and prepared in accordance with SOX controls. These representations serve as evidence for the audit and is typically performed by companies prior to filing its audited financial statements with the U.S. Securities and Exchange Commission.

24. Moorefield's performance during his first several months at Aviat was highly positive. Moorefield participated in Aviat's mid-year performance review cycle, which covered his employment through December 2024. His then-manager Connaway, gave Moorefield an extremely positive review, stating that Moorefield had "done a nice job after stepping into the Corporate controller role within Aviat," that his "accounting skills, work ethic, and ability to work cross functionally are all on fully display," and that he was "well on his way" to achieving his goal of becoming CFO "with his deep finance and controllership background." (Attached hereto as **Exhibit A**, is Moorefield's FY25 Mid-Year Performance Review & Discussion).

25. Connaway further stated Moorefield's "future is bright and he's bringing very good process discipline into Aviat's controllership group," and that Moorefield, in general, was "doing a very nice job in helping to lead the finance department, and is already making a very positive impression on other stakeholders (Eg Pete, and Scott)." Id.

26. In fact, Moorefield made such a positive impression that both Connaway and Aviat's then-CEO, Pete Smith ("Smith"), communicated to Moorefield that he was next in line for the CFO position if Connaway were promoted to CEO or left the company.

**B. Moorefield Learns of Suspected Fraud and Improper Revenue Recognition**

27. "Revenue Recognition" is the accounting process companies use to determine when and how much revenue to report in its financial statements. This process is governed by financial standards such as ASC 606, under which revenue is recognized when a company performs services or provides goods promised under the sales contract even though payment will be received after performance of the contract is complete.

28. On or about May 29, 2025, a member of Moorefield's team informed him of suspected fraud and/or improper Revenue Recognition. Specifically, the team member reported that Aviat booked revenue for sales contracts that were never performed and that Aviat could not invoice and would not receive payment according to the contractual terms.

29. This team member told Moorefield she had concerns that Aviat's Indonesia sales team was falsifying customer acceptances and other documents to generate revenue for work the was never going to be performed. She further reported that local salespeople were signing, creating, and manipulating documents to make them appear to have originated from customers.

30. Moorefield immediately began investigating the concerns. However, Aviat was unable to provide Moorefield with documentation demonstrating that the contracted goods were delivered, or that the performance obligations for numerous sales contracts were completed.

31. While Aviat obtained Letters of Intent ("LOI") and customer acceptance documentation from customers to support the revenue recognized, Moorefield raised repeated

concerns with Aviat's inability to invoice against the LOIs and customer acceptance documents. Moorefield even repeatedly questioned whether these documents were legally binding.

32. Moorefield became concerned that approximately $30 million in revenue, approximately 8% of Aviat's annual total revenue, may have been improperly reported for contracts that had not been performed.

33. Because Aviat's materiality threshold was approximately $2-3 million, if Aviat did not perform the contracts at issue, Aviat would have to restate revenue and deduct the approximately $30 million in sales that were not completed. This would have had a material impact on Aviat's prior year financial statements which in turn would significantly impact Aviat's stock price.

34. Moorefield continued to have concerns regarding the validity of the arrangements and revenue reported in FY2025 and potentially FY2024.

**C. Moorefield Reports His Concerns & Aviat Beings an Investigation**

35. On May 29, 2025, Moorefield first communicated his concerns regarding the suspected fraud and improper Revenue Recognition to Connaway.

36. On May 30, 2025, Moorefield communicated the same concerns via email to Erin Boase ("Boase"), Aviat's General Counsel and Vice President of Legal Affairs.

37. On or about May 31, 2025, Smith called Moorefield and expressed that he was upset Moorefield raised his suspected fraud concerns in writing. Smith discouraged Moorefield from doing so in the future, notwithstanding that reporting such concerns was required per the Financial Code of Conduct.

38. By June 12, 2025, Boase and Connaway informed Moorefield that they intended to launch an internal investigation concerning the same underlying matter following a tip received through Aviat's hotline.

39. The stated scope of the internal investigation was whether documents being used to support Revenue Recognition were fraudulent.

40. At the outset of the internal investigation, Moorefield made it clear to Boase, Smith, and Connaway that Revenue Recognition itself needed to be included within the scope of the investigation because of the concerns regarding whether the underlying contracts had actually been performed.

**D. Moorefield Raises Broader SOX and Management Override Concerns**

41. On or about August 14, 2025, Moorefield called the Audit Committee Chair, Scott Halliday ("Halliday"), to raise concerns regarding Aviat's Sarbanes-Oxley Act Controls.

42. During that call, Moorefield explained that Aviat lacks transparency and visibility into certain business transactions and there is a high risk of management override. Moorefield specifically identified concerns regarding Aviat's CEO and CFO.

43. Moorefield provided Halliday with at least one specific example of alleged wrongdoing. Moorefield explained that Connaway had asked a team member not to book an accounting entry, which Moorefield believed circumvented controls and would cause the financial statements to be misleading. Moorefield further explained that when he learned of this conduct, he was unable to ensure that the entry was properly booked.

44. Because of these concerns, Moorefield informed Halliday that he was uncomfortable signing the Deloitte representation letter as part of Aviat's 10-K filing.

45. On August 20, 2025, Moorefield sent Boase an email documenting his concerns and explaining he wanted to find a path forward that would allow him to sign the Deloitte representation letter. Moorefield stated he would need three things to be addressed before he could sign the Deloitte representation letter: (1) a special representation letter from Smith; (2) a better understanding of scope and results of the Indonesia investigation, which were never shared with Moorefield in full; and (3) documentation of his protected activities and assurance that he would not face retaliation in the future.

46. On August 20, 2025, Moorefield also informed Boase that he believed Smith's action on their May 31, 2025 call violated the Financial Code of Conduct and constituted an attempt by Smith to impede a whistleblower investigation.

47. Later that day, on August 20, 2025, in response to his inquiry regarding the scope of the investigation, Boase informed Moorefield that the investigation did not include Revenue Recognition. Moorefield learned the investigation was limited to whether customers signed certain documents, rather than whether the underlying documents were legally binding or whether the underlying contractual performance obligations had been satisfied.

### E. Connaway Announces He Is Leaving Aviat & Moorefield Is Passed Over for Interim CFO

48. On or about August 27, 2025, Connaway announced that he was leaving Aviat in mid-October.

49. Even though both Smith and Connaway had previously communicated to Moorefield that he was next in line for the CFO position, after Connaway's departure was announced, Aviat named Andrew Fredrickson ("Fredrickson") as interim CFO.

50. Fredrickson had significantly less experience than Moorefield. Further, like Moorefield, Fredrickson lives in North Carolina rather than Austin, Texas.

51. Immediately following this, Aviat's head of HR, Spencer Stoakley ("Stoakley"), called Moorefield and told him that they thought he was "too busy" to serve as interim CFO. However, Aviat never consulted Moorefield about whether he was too busy to serve as interim CFO.

**F. Smith Signs the Special Representation Letter**

52. On September 8, 2025, Smith signed the special representation letter requested by Moorefield. The letter was specifically addressed to the Audit Committee rather than to Moorefield, but Moorefield received a signed copy. The letter laid out Moorefield's concerns.

53. However, the Audit Committee never interviewed Moorefield about his concerns described in the special representation letter and those concerns were not included within the scope of the investigation.

54. In particular, the investigation did not verify whether the performance obligations underlying the revenue at issue had been satisfied, nor did it provide guidance concerning how to invoice and collect on the contracts in question.

55. Moorefield repeatedly requested that Revenue Recognition be included in the scope of the investigation. While Revenue Recognition was initially included, the Audit Committee and Board later removed it without explanation.

56. Moorefield subsequently asked Boase whether Aviat disclosed Smith's special representation letter to Deloitte. Moorefield communicated that such disclosure would be required because Smith's special representation letter was used to support EL-15 (Sarbanes-Oxley Act Controls) and his signing of the Deloitte Representation Letter.

57. Although Smith provided a special representation letter to Moorefield and the Audit Committee, Moorefield has no evidence that the Audit Committee provided this letter to Deloitte so they could conduct a proper review of the issues he had raised.

58. Deloitte did not ask Moorefield any questions regarding Smith's special representation letter, nor did they ask him about the reasons why he requested it.

**G. Moorefield Signs the Deloitte Representation Letter & Aviat Fires Him Hours Later**

59. On September 10, 2025, Moorefield filed Aviat's June 27, 2025 annual 10-K and signed the Deloitte representation letter to facilitate the filing.

60. Despite the prior verbal agreement between Connaway and Smith that Connaway would remain at Aviat through mid-October, immediately following the 10-K filing Smith aggressively removed Connaway from the offices and terminated his employment.

61. On that same day, Stoakley and Laura Almanza from human resources terminated Moorefield's employment.

62. Indeed, Aviat terminated Moorefield's employment hours after he completed and signed the Deloitte representation letter facilitating Aviat's 10-K filing.

63. Moorefield was told his termination was due to a reorganization in which the Corporate Controller role was being moved to Austin, Texas.

64. Moorefield then repeatedly asked Stoakley whether he could relocate to Austin and keep his job. Moorefield even offered to pay his own expenses in relocating.

65. Stoakley rejected Moorefield's request and stated that Aviat was hiring the role in Austin. Moorefield responded that, because he was willing to relocate and Aviat nevertheless refused to allow him to do so, that this was not a reorganization, it was a personal termination.

66. Moorefield told Almanza she needs to document that he had asked twice whether he could relocate to Austin and had been told no, without being given a reason why he could not relocate.

67. Moorefield also asked Stoakley and Almanza whether they were aware of his engagement in protected activities, but neither of them responded to that question.

**FIRST COUNT**

**(Retaliation in Violation of the Sarbanes-Oxley Act, 18 U.S.C.A. § 1514A(a)(1)(C))**

68. Plaintiff repeats and realleges each of the allegations set forth in the preceding paragraphs as if set forth at length herein.

69. Defendant Aviat Networks, Inc. is a company within the meaning of 18 U.S.C.A. § 1514A, because it has “a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*),” and is “required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)).” 18 U.S.C.A. § 1514A(a).

70. Defendant Aviat U.S. Inc. is a company within the meaning of 18 U.S.C.A. § 1514A as it is a subsidiary of Aviat Networks, Inc.

71. Plaintiff was an employee within the meaning of 18 U.S.C.A. § 1514A.

72. Defendants violated 18 U.S.C.A. § 1514A(a)(1)(C) because their decision to terminate Moorefield was motivated by his reporting of suspected fraud, which is a protected activity under SOX, 18 U.S.C.A. § 1514A.

73. As detailed in the preceding paragraphs, Moorefield engaged in activities protected under 18 U.S.C.A. § 1514A by providing information and reporting suspected fraud to “persons with supervisory authority over” him and to persons working for Aviat “who has the authority to investigate, discover, or terminate misconduct.” See 18 U.S.C.A. § 1514A(a)(1)(C).

74. Moorefield reasonably believed that the information he reported to Boase, Connaway, Smith, and Halliday, involved conduct that violates rules and regulations of the Securities and Exchange Commission as well as provisions of Federal law relating to fraud against shareholders.

75. Defendants were fully aware of Moorefield's protected conduct because his concerns were laid out during various calls and in emails sent to Boase, Smith, Connaway, Halliday and other members of Aviat.

76. In fact, on numerous occasions Moorefield specifically asked if Defendants were aware of his protected activities and at least once, Boase assured Moorefield that Defendants took his protected activities seriously.

77. Moorefield was terminated just a few hours after he facilitated the filing of Aviat's 10-K.

78. Defendants did not inform Moorefield that his termination was due to poor performance. Rather, Aviat concocted relocating his role to Texas as the reason for his termination, but that was not true.

79. Moorefield's protected activity was the reason for his termination.

80. Defendants, through their employees, contractors, subcontractors, and/or agents, retaliated against Moorefield for reporting suspected fraud by terminating him.

81. Defendants cannot prove by clear and convincing evidence that they would have taken the same action in the absence of Moorefield's protected activity.

82. As a direct result of Defendants' retaliatory conduct, in violation of 18 U.S.C. § 1514A, Moorefield has been damaged.

**ATTORNEY'S FEES**

83. Plaintiff reincorporates each of the foregoing paragraphs as if they were set forth fully herein.

84. Plaintiff is entitled to recover attorney's fees and costs for bringing this action pursuant to the Sarbanes-Oxley Act.

**JURY DEMAND**

Plaintiff demands a trial by jury.

**RELIEF REQUESTED**

**WHEREFORE,** as a result of the foregoing, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, special and consequential damages necessary to make Moorefield whole; attorney's fees, litigation costs, and expert witness fees pursuant to 18 U.S.C.A. § 1514A(c)(2)(C); actual and liquidated damages for the period of time provided by law, including appropriate back pay and reimbursement for lost wages, pension, insurance, bonuses, and all other benefits; pre-judgment and post-judgment interest as allowed by law; and any further relief this Court deems just and proper.

Respectfully submitted,

**MCGINNIS LOCHRIDGE LLP**

By: */s/ Austin L. Jones*
Austin L. Jones
State Bar No. 24116579
ajones@mcginnislaw.com

1111 W. 6th St. Bldg. B, Ste. 400
Austin, Texas 78703
(512) 495-6000 (t)
(512) 505-6385 (f)

***Attorney for Plaintiffs***